**THE LAW OFFICE OF JUDITH G.  AMORSKI, ESQUIRE**
10 West Main Street, Second Floor
Freehold, New Jersey 07728
Phone: 732-683-1227 Fax:. 732-683-1320
Attorney for Plaintiff
Attorney # 009312004

_____

| | | |
|---|---|---|
| | : | UNITED STATES DISTRICT COURT |
| NELLY MUNIKAH | | OF  NEW JERSEY |
| | : | |
| Plaintiff, | | |
| | : | Docket No; |
| BIOREFERENCE LABS | : | **COMPLAINT** |
| | : | |

_____

## INTRODUCTION

Plaintiff brings this action pursuant to  42 U.S.C. § 1981 a,  to remedy acts of employment discrimination and retaliation perpetrated against her by BIOREFERENCE LABS (Defendant). Plaintiff contends that Defendant officials discriminated against her by treating her in an adverse manner and ignoring her reporting of serious life-threatening mistakes being made by her fellow employees thereby subjecting her to ridicule and discrimination because of and only because of  her race (African-American). Plaintiff further asserts that management retaliated against her for having complained about such discrimination, which created a hostile work environment for her, caused her to suffer embarrassment, emotional upsetment, humiliation and ultimately terminated her employment when she continued to speak out against the discrimination.

## JURISDICTION

This Court has jurisdiction over the subject matter of this civil action pursuant to 42 U.S.C. § 1981.

VENUE

Venue is proper in this judicial district under 42 U.S.C. Section 1981 and as extended to retaliation claims; as Plaintiff was employed by BIOREFERENCE LABS whose primary place of business and employment was in Elmwood, New Jersey

PARTIES

Plaintiff is an African American Woman who began working at BIOREFERENCE LABS on or about May, 2010. Plaintiff began working at BIOREFERNCE LABS as a cytologist. BIOREFERENCE LABS is located at 481 H. Ross Drive in Elmwood Park New Jersey.

DEFENDANT BIOREFERENCE LABS is a company located in Elmwood Park New Jersey which provides laboratory testing and clinical diagnostic services to physicians, hospitals and health care providers.

STATEMENT OF FACTS

Plaintiff was hired as a cytologist and in that capacity her primary responsibility was to evaluate patient cell samples on slides to determine whether there are any subtle changes that would indicate some form of illness.

1. On or about 2013 due to her exemplary work and near perfect record, Plaintiff was promoted to the position of Quality Control Cytologist. Plaintiff had received steady raises and no complaints or mistakes in her work. The function of a Quality Control

Cytologist is to provide a second review of slides that are reviewed by the Cytologists to ensure there are no changes which were missed.

2. Plaintiff's new supervisor was named Christopher Schouest.  Chris is a white male in his 40's.  Plaintiff noticed that there were no other people of color within the entire facility but did not think anything of it, until she began to notice that many of her colleagues openly spoke in a derogatory manner about Black and Hispanic people. She began to notice intentional discrimination which she would  not have experienced but for the fact that she was black.

3. Plaintiff then began to notice that her supervisor Chris Schouest specifically treated her differently than all of her other white colleagues, because she is black.  He scrutinized her work repeatedly, he gave her disproportionately more work than any of her colleagues.

4. Plaintiff immediately began noticing that Chris and a co-worker Penny were treating her differently by placing more work on her than others.  Penny a white woman spoke out frequently against people of color and made comments that were derogatory, demeaning and caused upsetment. They, in addition to other co-workers, were constantly remarking about Black and Hispanic people and speaking about how Black and Hispanic workers were needed to do "meaningless tasks and hard work", and how they were incapable of climbing the corporate ladder based on merit.  This created a hostile environment and  the racial discrimination made the Plaintiff extremely uncomfortable.   This behavior began once the company relocated her to the lab which was under Mr. Schouest's management and lasted throughout the duration of her employment. At all times relevant, Chris Schouest was aware of this

discriminatory treatment  and participated in it. Plaintiff chose to focus on her work and ignore the comments as best she could.  NO comments were made about white people. The white employees were treated with respect and their work was taken seriously.

5.  In the beginning of 2018 it became particularly unbearable.  Plaintiff began to notice the comments increase.   On a number of occasions, Penny spoke about people of color, Hispanic culture,  Black people  and 'how things would be handled in Alabama" in a very derogatory way on a regular basis and in her presence. Penny often looked at her while she was saying such comments.  But for the fact that Plaintiff is black, Penny would not have made such comments.

6.  Chris Schouest was aware of the comments and allowed the conversations to occur without ever reprimanding her, or any other employee.  Chris Schouest's office was close to the workspace and the conversations could be heard within the space.

7.  Penny constantly talked about people of color and hispanic women as "Maria's".  She frequently stated that she needed, "a Maria" when discussing needing various tasks done around her house and around her workspace. This was heard by all co-workers and Chris Schouest's office was close to the workspace and the conversation could be heard within the space.

8.  On another occasion another white co-worker Yelena was discussing in the presence of many colleagues how 'certain people' have so many children and she cannot stand it. She then turned and looked at Plaintiff and said, "…except your kids, they are ok". Plaintiff was embarrassed and upset. But for the fact that Plaintiff is black, these comments would not have been made to her.  It was clear these co-workers were

constantly discussing Black and Hispanic people and their disdain for them but nothing was ever done to stop it or even correct it. Chris Schouest was sitting within hearing distance and said nothing, however when this same co-worker made a comment about someone's weight she was immediately called into his office, reprimanded and sent home for the day. It was clear that Chris was allowing the racial discrimination aimed toward Plaintiff but when there was insulting language as to someone's weight, it was immediately addressed.

9.  On a number of occasions Penny would discuss "Alabama". Penny announced that in Alabama things are "handled differently". She announced that if a white person became pregnant by a black person they would absolutely have to abort the baby. She went on to say the community around them would almost require it and that they would have no choice. Penny said this in Plaintiff's presence and intentionally to upset her. But for Plaintiff's race these comments would not have been made. Plaintiff was very upset by these comments and felt uncomfortable.

10. On another occasion Plaintiff noticed that Chris's children were permitted to come into the office and take on tasks that were usually performed by lab personnel. It was well-known in that in the County where Plaintiff and Chris Schouest's children attended school, the High School required some form of intern-like community hours at a workplace in order to fulfill the requirements for graduation. Chris's children were obviously in the office for that purpose and so Plaintiff asked Chris if her own son could complete the requirement at work as well. Chris replied by saying, No, "I do not want to get involved in any illegality", he then told her he should go do the requirement at some charity instead. Plaintiff was embarrassed. But for Plaintiff

and her children being black, her request to allow her child to complete the internship would have been granted.

11. Plaintiff was not able to understand this as his children were coming to the office on a regular basis, signing onto the computer and accessing the computer which had all patient information but yet he would not allow her son to complete any kind or internship or required community service for High School. Plaintiff believes it is because her children are black. Plaintiff asserts that his comment as to "illegality" was specifically made because she and her children are black as the office frequently discussed their disdain for people of color.

12. A few years after Plaintiff was transferred, an employee named "Savan" was hired. He introduced himself as a "White Arian Indian". Plaintiff recalls one day in the presence of others and within Chris's hearing, he told Plaintiff, "…you are not like other black people, you are hardworking, you show up every day and you are different". But for Plaintiff being black this comment would not have been made to her.

13. Plaintiff's job required her to review other cytologists' work in order to double check the work. When there is an issue, it is to be flagged and reviewed again before going to the Pathologist for final review. The function is essential as it is literally the diagnostic procedure used to determine whether a patient will be told of a possible serious health issue.

14. Over the course of her work, Plaintiff noticed that there were a number of slides which contained variations that were not picked up by some of the cytologists and thus flagged the slides for review.

15. Plaintiff noticed that Penny's slides were ones that were frequently flagged.

16. Plaintiff performed her job and noted discrepancies where appropriate.  The average Quality Control being flagged is about 4 per week but Plaintiff had begun noticing about 20 a week in the department.

17. Plaintiff brought this to the attention of the Pathologist.  The next day Chris Schouest called her into his office and said, I am "hearing Complaints" someone thinks you are trying to get them fired.   Plaintiff responded by explaining that  since a pathologist always  reviews a slide which has been flagged in order to determine whether they agree, she asked him to look in the computer to see whether the slides she flagged had been reviewed by the pathologist and whether the pathologists agreed with her findings. Chris did look and saw that <u>on all slides a pathologist reviewed and agreed with Plaintiff's findings. There were not any slides which Plaintiff had flagged where a Pathologist did not agree. Chris then said that he was going to address the matter.</u> But for the fact that Plaintiff is black her work would have been taken seriously.

18. Thereafter plaintiff specifically tried to avoid reviewing Penny's slides and allowed other Quality Control employees to review them because she knew that Penny; i. had frequent mistakes, ii. had expressed her disdain for black people and iii seemed to have a very close relationship with Chris Schouest and did not want to upset her boss. Plaintiff thought it would be better if other people caught the mistakes and flagged the slides, if possible.

19. Plaintiff would leave Penny's slides for other cytologists so that she was not accused of 'trying to get her fired'.  On one occasion however when it was a weekend Plaintiff

was the only one working and had to review Penny's slides. Plaintiff flagged 4 mistakes.

20. Plaintiff was immediately taken off of pathology quality control. Chris Schouest said, "the amount you are finding is too high".  Plaintiff is aware that there is a procedure in place for reprimanding all employees. There is a process by which you are shown the error, given time to correct it, if it happens again, you receive a warning and if you then repeat the mistake you are removed from Quality Control.  Plaintiff asked to be shown (as required in step one of the process), which slides were in error but Chris Schouest said he "could not find them and it was too difficult to identify and get them".  Plaintiff objected to being removed from Quality Control, identified all the slides that she had reviewed prior to being removed from Quality Control,  and asked Chris Schouest to review the set of slides she had flagged. Chris Schouest declined to do so but stated that he had reviewed her recent work and upon seeing her exemplary work in noting the errors he responded, *"Congratulations, your back on Quality Control"*.

21. Thereafter the only time plaintiff reviewed Penny's slides was when there were no other Quality Control employees working to do it. The next occasion when Plaintiff flagged a slide of Penny's she brought it to the Doctor to review. The Doctor agreed with her and noted that Penny had deemed cells 'negative' but Plaintiff noted they were 'high grade' indicating cancerous cells.   This was a serious error as it literally affects a patients life.

22. The next day when Plaintiff reported to work she was called into Chris Schouest's office.  He then asked Plaintiff to sign a PIP (Personal Improvement Plan).  He

explained that she was flagging too many slides. Plaintiff contacted the Pathologist to see whether he had suggested this or whether there was an issue with the slides but even though Chris had stated within the PIP that "Nelly have to be careful which cases she forwards to the Pathologist", the Pathologist had said he had no idea what that was about did not know why she was being asked to sign a PIP with Human Resources. This in itself was not procedural/customary because prior to this incident, all diagnostic issues were handled within the department and not within Human Resources department.

23. Plaintiff then went to the Human Resources Department to report the incident and to explain that she has believed all of the treatment including the constant comments, the disparate treatment, the extra work, the extra scrutiny and the refusal to trust her work which was repeatedly shown to be correct by Pathologists, was all because she is black as they all continuously speak about Black and Hispanic people and Chris allows it.

24. She also explained that she had reported slides which were serious errors involving the patient's well being and that Chris Schouest was in essence unwilling to listen or take her seriously and that he had allowed this discrimination and disparate treatment to go on for years. A formal investigation into the Plaintiff's allegations began at this point.

25. A few days later, Chris Schouest called her into the office.  There was a representative from Human resources present as well.  He then stated that he had gone back and checked her time cards and saw that she was working during lunch, (a practice that other white employees also did regularly).   Plaintiff explained that she

has never been told not to work during lunch. The representative from Human Resources attested to the fact that other people have worked through lunches but they were only reprimanded. Plaintiff asked Chris what date he began scrutinizing her time cards and the date Chris Schouest gave was the very day, in fact a few minutes after, Chris Schouest's interview with Human Resources about the racial discrimination, and the fact that she was being treated badly as a result and that it was now interfering with patients health.

## COUNT ONE

(Racial Discrimination in Violation , 42 USC s 1981 (a)  Defendants  through their employees discriminated against Plaintiff because she is black by treating her differently than other white employees, constantly scrutinizing her work, dividing work in an unfair matter which caused Plaintiff to have substantially more work than anyone else and repeatedly denied her any of the same procedures which were in place or all employees only because she is black.  Defendants  permitted a hostile work environment by allowing co-workers to constantly talk about Black and people of color in a derogatory manner causing embarrassment and upsetment. But for Plaintiff being black, she would  not have been treated in such a manner.

BIOREFERENCE LABS is vicariously liable for the actions of their supervisor and employees where there is an ongoing pattern of discrimination and where they allowed Plaintiff, a Black employee to be treated badly simply because she is black.

WHEREFORE, PLAINTIFF demands judgment against BIOREFERENCE LABS,  for actual damages, emotional distress and anything other that the court

deems just for intentional discrimination against the Plaintiff simply because she is black.

## COUNT TWO

(Retalitaion in Violation , 42 USC s 1981   Defendants  through their employees retaliated  against Plaintiff because she is black by terminating her after she continued to speak out against the discrimination against her. Plaintiff repeatedly noted that it is only her work that is scrutinized and that although her work is approved by actual Pathologists her own supervisor who is not a pathologist refused to believe her because she is black and ultimately fired her for complaining about it.

BIOREFERENCE LABS is vicariously liable for the actions of their supervisor and employees who fired her after she complained that she was being treated badly and not taken seriously simply because she was black and for no other reason. Plaintiff then became aware that Chris Schouest told fellow employees that he was "going to make it very hard for her to ever get any information about her employment".  Plaintiff later realized that all of her information had been deleted from the computer system. This was also an act of retaliation and discrimination because Plaintiff is a black woman.

WHEREFORE, PLAINTIFF demands judgment against BIOREFERENCE LABS, for actual damages, emotional distress and anything other that the court deems just for

retaliation, specifically because the Plaintiff was fired for complaining about being discriminated against because she is Black, specifically, African American.

But for Plaintiff being black, she would not have been terminated for doing her job and reporting the errors of her white co-worker and for speaking out against the intentional discrimination against her.

## DESIGNATION OF TRIAL COUNSEL

JUDITH G. AMORSKI, ESQUIRE is hereby designated as trial counsel for Plaintiff.

## JURY DEMAND

Plaintiff demand a trial by Jury.

## CERTIFICATION

It is hereby certified that, to the best of my knowledge, there are no other civil actions or arbitration proceedings involving this matter with respect to this matter and no other parties need to be joined at this time.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

9/5/2022                                                    /S/JUDITH G. AMORSKI ESQ

## <u>CERTIFICATION OF SERVICE</u>

I certify that the within pleading has been served within the time period allowed under

New Jersey Law.

9/5/2022                                                          /S/JUDITH G. AMORSKI ESQ