<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NELLY MUNIKAH, *Plaintiff*, v. BIOREFERENCE LABORATORIES, INC., *Defendant*. | Civil Action No. 22-5570 **OPINION** January 28, 2026 |

**SEMPER**, District Judge.

    **THIS MATTER** comes before the Court on Defendant BioReference Laboratories, Inc.'s ("Defendant" or "BioReference") motion for summary judgment. (ECF 59, "Mot.") Plaintiff Nelly Munikah filed an opposition to Defendant's motion. (ECF 64, "Opp.") The Court reviewed the submissions made in support of and in opposition to the motion and decided the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons stated below, Defendant's motion for summary judgment is **GRANTED**.

**I.**    <u>**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]</u>

    This lawsuit arises from Plaintiff's allegations of a hostile work environment and retaliation following her termination from her employer. Plaintiff Nelly Munikah was employed

---

[1] The facts and procedural history are drawn from Defendant's brief in support of the motion for summary judgment (ECF 59-1), Defendant's statement of undisputed material facts (ECF 59-2, "DSMF"), Plaintiff's opposition papers containing a statement of facts (ECF 64), and Plaintiff's response to Defendant's statement of material facts (ECF 64, Exhibit P, "Pl. Response."). Plaintiff withdrew her statement of material facts, which falsely claimed that Defendant did not produce documents in discovery and quoted unproduced emails in the submission. (ECF 76,)

by Defendant BioReference as a cytotechnologist for ten years. (Opp. at 7, 11.) Plaintiff, a black woman, was hired in 2010 and worked in Defendant's New Jersey lab, and in 2013 she was transferred to Defendant's Florida location. (*Id.*; DSMF ¶ 2.) As a cytotechnologist, Plaintiff examined specimens for the presence of abnormal cellular changes and pathogens, which in practice constituted reviewing and diagnosing slides with cell samples. (DSMF ¶ 3.) Plaintiff "saw herself as an efficient screener, and she was typically able to review the maximum number of slides permitted per day." (*Id.* ¶ 4.) Cytotechnologists employed by BioReference are non-exempt hourly employees subject to a Recording Work Hours Policy (the "Policy") that "strictly" prohibits off-the-clock work and requires employees to record their time worked accurately. (*Id.* ¶¶ 7-8.) The Policy "clearly states that those who do not accurately record their time are subject to discipline, up to and including termination." (*Id.* ¶ 8.)

At Defendant's Florida lab, Plaintiff reported to the supervisor of Cytology Operations, Christopher Schouest. (*Id.* ¶ 2.) In 2014, Schouest complemented Plaintiff's work and gave her additional quality control duties, which involved reviewing diagnoses made by her peers. (*Id.* ¶ 9; Opp. at 8.) In 2017, after Hurricane Irma hit Florida, Plaintiff began working weekends and taking Mondays and Tuesdays off, even though her supervisor continued to work regular weekdays. (DSMF ¶¶ 10, 11.) That same year, Schouest removed Plaintiff's quality control duties for several weeks because of issues with her diagnoses. (*Id.* ¶ 12.) Plaintiff believed that Schouest temporarily removed these duties because she had corrected slides reviewed by another cytotechnologist, Penny Uzzetta, who Plaintiff believed Schouest "favored" over the others. (*Id.* ¶¶ 14, 15.) Plaintiff also believed that Schouest and Uzzetta were "romantically involved because they seemed close[.]" (*Id.* ¶ 15.) At Plaintiff's request, the lab Pathologist, Dr. Cote, reviewed

her slides and "disagreed and agreed with some of Munikah's calls[.]" (*Id.* ¶ 13; Opp. at 8.) Schouest then returned Plaintiff's quality control duties. (Opp. at 8.)

On June 29, 2018, Schouest issued Plaintiff a written warning for working unscheduled and unapproved overtime hours. (DSMF ¶ 17.) The warning stated that Plaintiff "failed to clock out at the 8 mark of scheduled shift 7 of 9 days worked this pay period after 2 previous email request[s] to keep an eye on clock out time." (ECF 59-6, "Ex. A".) The warning called for corrective action, specifying that Plaintiff "will not work unscheduled shifts (weekend shifts) and timecard will be monitored daily until this has been resolved." (*Id.*) During this period, Schouest observed that Plaintiff was diagnosing low-grade squamous intraepithelial lesion ("LSIL") at a rate "well above" the laboratory average. (DSMF ¶ 21.) On August 10, 2018, he brought these "abnormal submissions" to Plaintiff's attention and provided her with examples to show that her diagnostic methods were not "in line" with her colleagues' work. (*Id.* ¶ 22.) On September 2, 2018, after Plaintiff continued to work overtime without permission, Schouest issued another written warning. (*Id.* ¶ 18.)

Ten days later, on September 12, 2018, Schouest met with Plaintiff and Human Resources ("HR") partner Leah Browne to place Plaintiff on a performance improvement plan ("PIP") because her LSIL diagnosis rate had increased in the month of August, after the issue had already been brought to her attention. (*Id.* ¶ 23.) After being placed on the PIP, Plaintiff met with Browne to complain that the PIP was unfair, and that Schouest was targeting her unfairly due to favoritism of other cytotechnologists like Uzzetta. (*Id.* ¶ 29.) Plaintiff told Browne that she "would gather evidence to prove she should not have been placed on the PIP." (Opp. at 10.) Plaintiff then manually went through all the slides she reviewed for quality control over the past three months to disprove the necessity of the PIP, which entailed "extensive unauthorized off-the-clock-hours"

3

of work. (DSMF ¶ 32.) Plaintiff did not seek permission for these additional hours, nor did Schouest or Browne authorize her to do so. (*Id.* ¶ 33.) On September 21, 2018, Schouest noticed on Plaintiff's daily work reports that she was spending "considerable time compiling information regarding whether the pathologist agreed with her diagnoses, so he checked to ensure Munikah had signed out slides for review," and noticed that she had signed out slides "hours after she clocked out." (*Id.* ¶ 35.) Schouest discovered that Plaintiff has worked a total of 70 unauthorized, off-the-clock hours in 2018. (ECF 59-6, "Ex. J".)

That same day, Schouest reached out to BioReference management to report Plaintiff's off-the-clock work and suggested that Plaintiff move back to her pre-2017 Monday through Friday work shift to help combat the issue. (DSMF ¶ 36.) BioReference's Executive Vice President and Laboratory Director Dr. James Weisberger, who was based in New Jersey, instructed that Plaintiff should be terminated and "noted another employee was terminated for similar issues." (*Id.* ¶ 37.) Five days later, on September 26, 2018, Browne and Schouest met with Plaintiff to explain that BioReference was terminating her employment because of her off-the-clock work, and they explained that the decision came from management in New Jersey. (*Id.* ¶ 38.) Defendant terminated Plaintiff rather than give her a warning "because of the egregiousness of her violation." (*Id.* ¶ 42.)

Following her termination, Plaintiff sent two grievance letters to Defendant. (*Id.* ¶ 43.) In her first letter dated October 4, 2018, Plaintiff wrote that her grievances include "Discrimination, Harassment, and Retaliatory Treatment; Inequitable, Prejudiced, and Weaponized Allegations of 'Unauthorized' Work Hours; and the Blatant Misrepresentation, Omission, and Falsification of Facts" which "were made known to HR weeks prior to my being terminated" by Defendant. (ECF 59-4, "Ex. H".) Plaintiff's letter nor the attached "Explication of Grievances" contained any

4

allegation of race-based discrimination or examples of inappropriate commentary experienced during her employment with Defendant. Plaintiff's second letter, dated October 6, 2018, included a detailed rebuttal of her diagnoses and a defense of her methods, as well as her hours worked. (*See* ECF 59-4, "Ex. G".) Under the heading "Example Eleven – Questionable Situations Worth Noting" – Plaintiff included three examples of race-related comments she experienced while employed by Defendant: that an unnamed colleague stated that there was a "black guy" in management looking out for her; that aspersions were cast on other black female employees who had joined management; and that her colleague Uzetta had speculated that another black employee had had schizophrenia. (*Id.* at 21-22.) After receiving Plaintiff's grievance letters, Defendant investigated the circumstances around her termination and determined the termination was appropriate. (DSMF ¶ 44.)

On September 22, 2022, Plaintiff filed a Complaint initiating this lawsuit in federal court. (*See* ECF 1, "Compl.") Plaintiff brings two claims under 42 U.S.C. § 1981 of a hostile work environment on the basis of race (Count One) and retaliation (Cout Two). (*See* Compl. at 10-11.) Defendant filed an Answer to the Complaint on January 9, 2023 (ECF 7), and the parties engaged in discovery. Plaintiff was deposed on May 29, 2024 (*see* ECF 59-4, "Pl. Dep.") and fact discovery was completed on June 13, 2024. (ECF 38.) Defendant filed the instant motion for summary judgment on April 22, 2025. (*See* Mot.) Plaintiff filed an opposition to the motion on June 24, 2025. (*See* Opp.)

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact [and] the moving party is entitled to a judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204

(3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

### III. ANALYSIS

Plaintiff claims that Defendant violated Section 1981 by creating a hostile work environment and by retaliating against her on the basis of race. (Compl. at 1.) Specifically, Plaintiff alleges that she was subjected to discrimination and harassment while employed by Defendant because of race-related comments her colleagues made, the unequal workload allotted to her, and the scrutiny of her work by her supervisor. (Opp. at 14.) Plaintiff insists that management retaliated against her for having complained about such discrimination. (Compl. at 1.) Plaintiff also alleges that "the PIP and her placement on it was a result of her race" and that her supervisor "was searching for a reason to fire her." (*Id.* at 20.) Defendant contends that there is no evidence that any actions taken by her employer or supervisor were tied to her race, and argues that because Plaintiff never complained about the alleged conduct until the filing of this lawsuit, the Court must dismiss both of her Section 1981 claims. (Mot. at 20.)

#### A. Hostile Work Environment

To succeed on a hostile work environment claim on the basis of race under Section 1981, a plaintiff must show that (1) the employee suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167

(3d Cir. 2013)). The first four elements establish a hostile work environment, and the fifth element determines employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

A hostile work environment is actionable only if it is so severe and pervasive that it "alters the conditions of the victim's employment" and creates an "abusive working environment*.*" *Greer v. Mondelez Glob., Inc.*, 590 F. App'x. 170, 173 (3d Cir. 2014) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)). The Third Circuit has made clear that "isolated incidents (*unless extremely serious*) will not amount to harassment" that is cognizable under Section 1981. *Castleberry*, 863 F.3d at 264 (emphasis in original) (cleaned up). "Whether an environment is sufficiently hostile or abusive is determined by considering the totality of the circumstances, including the 'frequency of the conduct; its severity, and whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Greer*, 590 F. App'x at 173 (quoting *Breeden*, 532 U.S. at 271).

Plaintiff's claim fails because the conduct she alleges does not rise to the level of severity necessary to prove a hostile work environment. Plaintiff's own admissions at her deposition prove there is a significant gulf between the conduct alleged in her Complaint and the conduct she recalls during her employment at BioReference. In her Complaint, Plaintiff alleges that Uzzetta "spoke out frequently against people of color and made comments that were derogatory, demeaning, and caused upset." (Compl. ¶ 4.) Plaintiff further alleges that "[at] all times" Schouest was aware of Uzzetta's alleged comments and participated in this "discriminatory treatment" of Plaintiff. (*Id.*) However, Plaintiff's deposition paints a different picture. Plaintiff testified that Uzzetta made these comments in the early morning before their supervisor Schouest or other colleagues had arrived. (Pl. Dep., 321:5-322:3; 339:20-340:7.) Plaintiff testified that these comments included

(1) that Uzzetta had a family member who was in an interracial relationship and her family pressured the couple to get an abortion; (2) "offhand" comments about former supervisors who were black, but those comments did not concern their race; (3) on two occasions Uzzetta referenced that her family employed a Hispanic woman to help with childcare; (4) she once commented that Native Americans "used to use black people to breed because of the genetics"; and (5) that she once stayed at a plantation and surmised that stains on the floor could be "slave blood" from when slaves were tortured. (Mot. 21-22.)[2] Plaintiff has provided no evidence that Schouest was aware of any of these insensitive and offensive comments.[3] Plaintiff also testified that she never heard Schouest make any negative, race-related comments or ever mention her race.[4] (Pl. Dep., 382:6-8.)

Plaintiff's Complaint also alleges that a different coworker told her she "was not like other black people, you are hardworking, you show up every day and you are different." (Compl. ¶ 12). However, in her deposition, Plaintiff testified that this coworker told her "I've never met somebody like you before" after "just talking [about] general things" and that he did not refer to her race or

---

[2] Plaintiff's testimony about the specific comments made by Uzzetta can be found on the following pages of her deposition transcript: 273-78, 280-84, 286-91, 312-13, 315-183, 326-28, 331-38. (*See* Pl. Dep.)

[3] Plaintiff confirmed that Schouest was not present for any of the alleged conversations, and she also testified that she never spoke to Schouest about the comments Uzzetta or any other colleagues made. (Pl. Dep., 342:16-343:12; 350:3-7; 352:13-353:5; 382:11-13.)

[4] The one race-related remark the Complaint alleges Schouest made to Plaintiff was similarly unsubstantiated by her deposition testimony. The Complaint alleges that Schouest's children were able to obtain community service credit for school by volunteering at BioReference, but when Plaintiff asked about her son doing the same, Schouest said he did not want to be involved in "any illegality." (Compl. ¶ 10.) Plaintiff testified at her deposition that Schouest's children were sometimes in the office, but she did not know if they were volunteering or received credit, and that when she asked if her son could come into the lab and "get some community hours" Schouest responded that "he didn't want anything to do with criminality." (Pl. Dep., 367:5-17.) Plaintiff did not ask what he meant by "criminality." (*Id.*, 367:18-20.)

9

use the word black specifically. (Pl. Dep., 354:6-10; 355:22-356:3.) Lastly, while Plaintiff alleged that another colleague commented that "certain people have so many kids and she cannot stand it" but Plaintiff's kids "are ok" (Compl. ¶ 8), Plaintiff admitted that she assumed this coworker was referencing race, though race was never explicitly mentioned. (Pl. Dep., 346:3-9.)

Plaintiff testified that these comments occurred sporadically over the course of five years, from 2013 and 2017. (Mot. at 20.) Such sporadic comments fail to create a hostile work environment as a matter of law. *See Greer*, 590 F. App'x at 173 ("Mere offensive utterances are insufficient to create a hostile environment, even if they engender offensive feelings in an employee.") (internal quotations and citations omitted). First, the comments Uzzetta made concerning race were not directed at Plaintiff. *See Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) ("[A]lthough there was some evidence in this case of inappropriate racist comments. . . this evidence was insufficient without more to establish a hostile work environment" where "no racist comment, written or spoken, was ever directed at [the plaintiff] himself"). Plaintiff does not claim that Uzzetta said anything negative to Plaintiff specifically about her or that she even commented on her race. (Pl. Dep., 325:1-5.) Indeed, Plaintiff testified that Uzzetta "didn't say anything negative about a black person." (*Id.*, 338:1-12.) While offensive and inappropriate, these sporadic comments do not show that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Therefore, such comments cannot be deemed severe or pervasive as contemplated by Section 1981. *See Oji v. Gannett Fleming, Inc.*, 2015 WL 1137974, at *7- 8 (D.N.J. March 13, 2015) (finding alleged racial harassment was not severe or pervasive, including comments made in plaintiff's presence that Asians had small genitals, use of the "n" word, and comments referring to African Americans as drug users and thieves).

Plaintiff has also failed to demonstrate that the alleged discrimination detrimentally affected her or would detrimentally affect a reasonable person. *See Breeden*, 532 U.S. at 271 ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"). The alleged acts, although unprofessional, do not constitute an "objective change in the conditions" of her employment. *Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 205 (3d Cir. 2001). Notably, Plaintiff first complained of these comments after Defendant terminated her employment. (*See* Mot. at 20.) Plaintiff testified that despite these comments, she was able to continue with her employment duties without issue. (Pl. Dep., 350:15-351:1.) Plaintiff testified that she remained "cautious" and felt "uncomfortable" but maintained a "professional relationship" with Uzzetta. (*Id.*, 351:2-10.) This is a far cry from the "objectively hostile" environment required to prove her claim. *Greer*, 590 F. App'x at 173 ("The threshold for pervasiveness and regularity of discriminatory conduct is high.") And because Plaintiff has not established that her supervisor was ever made aware of Uzzetta's racially insensitive remarks, she cannot establish *respondeat superior* liability. For these reasons, the Court grants summary judgment in Defendant's favor and dismisses Count One of the Complaint.

### B. Retaliation

To prove retaliation in violation of Section 1981, Plaintiff must establish a prima facie case that (1) she engaged in protected activity, (2) her employer took an adverse employment action against her, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) (citing *Moore v. City of Philadelphia,* 461 F.3d 331, 340–41 (3d Cir. 2006)). "In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981

violation."[5] *Id.* The key inquiry of the second element of a prima facie case is whether the alleged retaliation "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The third element of the prima facie case "identif[ies] what harassment, if any, a reasonable jury could link to a retaliatory animus." *Id.* (citing *Moore*, 461 F.3d at 342) (internal citation omitted). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to advance a legitimate non-retaliatory reason for its conduct. *Id.* If an employer advances such a reason, a plaintiff then must show that the proffered reason was a pretext for retaliation. *Moore*, 461 F.3d at 342.

Plaintiff alleges the adverse employment action she experienced was that Defendant placed her on a PIP and that "the whole reason her work was being scrutinized was due to her race." (Opp. at 19.) Plaintiff's retaliation claim fails for multiple reasons. First, she has not demonstrated that she engaged in protected activity.[6] Though Plaintiff claims that after she was placed on a PIP, she complained to HR that she was treated differently because of her race[7] (Compl. ¶ 23), the record shows that she did not list race as an issue or bring it up in her meeting with Schouest or Browne, Defendant's HR representative. (ECF 59-4, "Ex. P"). Plaintiff testified at her deposition

---

[5] Generally, to establish a basis for relief under Section 1981 a plaintiff must show "(1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir.2002) (internal citation and quotation marks omitted).

[6] Plaintiff does not identify what protected activity she engaged in while employed by Defendant. This is a threshold requirement of her retaliation claim. *Est. of Oliva*, 604 F.3d at 798; *Moore*, 461 F.3d at 340–41.

[7] A complaint of racial discrimination or profiling is recognized protected activity under Section 1981. *See Est. of Oliva*, 604 F.3d at 799.

12

that she complained about the PIP being unfair because it related to correcting Uzzetta's work, who Plaintiff believed her supervisor had a romantic relationship with and favored over Plaintiff. (Pl. Dep., 413:16- 415:2; 435:16-19.)  Browne's notes from her meeting with Plaintiff after she was placed on the PIP indicate that Plaintiff "brought up some concerns about" Schouest having "his favorites, that his tone is sometimes demeaning," but she did not use the words discrimination or harassment. (ECF 59-6, "Ex. B" at D193).

Defendant has put forth legitimate, non-retaliatory reasons for Plaintiff's PIP and termination that Plaintiff has failed to rebut.  Plaintiff violated Defendant's policy against working unrecorded hours which "clearly states that those who do not accurately record their time are subject to discipline, up to and including termination."  (DSMF ¶ 8.)  Plaintiff was warned about working unauthorized time twice before she was placed on a PIP, including in a written warning that Plaintiff signed (*see* Ex. A), but she continued to violate the Policy despite those warnings and despite the PIP.   Plaintiff admits in her brief that her supervisor "found violations of policy" but "it is clear that other employees do the exact same thing but do not get in any trouble for it." (Opp. at 20.)  However, Plaintiff has not produced any evidence of other employees who did "the exact same thing" but did not face adverse employment action in the form of a PIP or termination.[8]  (*Id.*)  The decision to terminate Plaintiff, which came from management in New Jersey, specifically mentioned that "another employee was terminated for similar issues." (DSMF ¶ 37.) The evidence uncovered in discovery points to "ongoing unacceptable conduct rather than" protected activity

---

[8] A review of other cytotechnologists in Defendant's Florida lab showed that "over a three-month period, only three had any off-the-clock work, one with an eleven minute violation, one with a thirty-two minute violation, and one with several violations that amount to less than five hours total." (Mot. at 37) (citing ECF 59-6, "Ex. I".)  Though none of these employees were terminated, these are significantly less unauthorized overtime hours than the seventy that Plaintiff worked while employed by Defendant.

13

like filing a complaint or complaining of racial discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 415 (3d Cir. 1999) (affirming district court's grant of summary judgment on retaliation claim). Plaintiff has therefore failed to rebut Defendant's legitimate, non-retaliatory reasons for the adverse employment action.

Because Plaintiff cannot identify protected activity she engaged in, an underlying Section 1981 violation, or a pretextual reason for the adverse employment action taken against her, she has failed to establish a prima facie case of retaliation under Section 1981, and the Court grants summary judgment in Defendant's favor. *See Est. of Oliva*, 604 F.3d at 799 (affirming district court's grant of summary judgment in defendant's favor in Section 1981 retaliation claim).

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (ECF 59) is **GRANTED**. Plaintiff's Complaint (ECF 1) is **DISMISSED** with prejudice. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig: Clerk
cc: Jessica S. Allen, U.S.M.J.
    Parties

14